UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SANDRA COOK,

                                        Plaintiff,

          v.                                               1:10-CV-259
                                                           (GTS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
_____

STEPHEN J. MASTAITIS, JR., ESQ., for Plaintiff
MARIA P. FRAGASSI SANTANGELO, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

          This matter was referred to me for report and recommendation by the Honorable

Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.     PROCEDURAL HISTORY

          Plaintiff filed[1] an application for Supplemental Security Income (SSI) on

November 7, 2006, claiming disability since September 29, 1993. (Administrative

Transcript ("T.") at 94-96).  Plaintiff's application was denied initially on January 23,

---

[1] In his decision, the Administrative Law Judge (ALJ) stated that plaintiff "protectively filed" her application on October 23, 2006. (T. 12).  When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340.  There are various requirements for this written statement. *Id.*  If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.  Even though plaintiff did not officially file her application until November 7, 2006, the disability transmittal documents all reflect the October 23, 2006 date. *See* (T. 50).

2007. (T. 59-62), and she requested a hearing before an Administrative Law Judge

(ALJ). (T. 63).  The hearing, at which plaintiff testified, was conducted on March 3,

2009. (T. 21-49).

In a decision dated April 9, 2009, the ALJ found that plaintiff was not disabled.

(T. 12-20).  The ALJ's decision became the final decision of the Commissioner when

the Appeals Council denied plaintiff's request for review on January 6, 2010.  (T. 1-

4).

## II.    ISSUES IN CONTENTION

Plaintiff makes the following claims:

(1)     The ALJ's decision that plaintiff has the Residual Functional Capacity
        (RFC) to perform the full range of light work is not supported by
        substantial evidence. (Pl.'s Br. at 9-12)

(2)     The ALJ should have called a vocational expert (VE). (Pl.'s Br. at 12-13).

(3)     The ALJ did not properly credit the opinion of plaintiff's treating
        physician and improperly analyzed plaintiff's credibility. (Pl.'s Br. at 13-
        23).

For the following reasons, this court finds that the ALJ properly analyzed, both

plaintiff's RFC and credibility.  Further, the ALJ gave appropriate weight to the

opinion of plaintiff's treating physician.  Finally, it was not necessary to call a VE to

testify because the ALJ properly found that plaintiff could perform a full range of light

work.

## III.   APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 404.1520 (disability insurance benefits) and in 416.920 (SSI) to evaluate both disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without

considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work.  Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

## B.  Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

4

"Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.   ALJ's DECISION

The ALJ first determined that, although he was required to consider all the medical evidence, SSI is not payable prior to the month following the month in which the application was filed, in this case, November 22, 2006. (T. 12).  Thus, for purposes of this case, the ALJ considered whether plaintiff was disabled since October 23, 2006, the date that the application was "filed." *Id.*

Plaintiff was working at the time of the ALJ's hearing, however, the ALJ found that plaintiff's work did not rise to the level of substantial gainful activity. (T. 14). The ALJ found that plaintiff had the following severe impairments: "back and neck

5

impairments and recent carpal tunnel syndrome." (T. 14).  Plaintiff also claimed that she suffered from "an anxiety disorder."  The ALJ found, however, that this alleged mental impairment was not severe because plaintiff's medication was relieving the symptoms, she did not allege any work related restrictions from this condition while she was on the medication, and she was not getting any psychiatric counseling. *Id.*

The ALJ then found that plaintiff could perform the full range of light work as described in the Social Security Regulations. 20 C.F.R. § 416.967(b). (T. 15).  In making this determination, the ALJ rejected plaintiff's complaints of disabling pain as "not credible" to the extent that they were inconsistent with the ability to perform light work. (T. 16-17).  The ALJ relied upon plaintiff's own testimony that, despite her impairments, she works four hours per day, four days per week, at a job involving substantial walking and occasionally lifting 20 pound towel bins. *Id.*  Although the amount of money made by plaintiff at her job was insufficient to constitute "substantial gainful activity," the ALJ considered plaintiff's testimony about her work to the extent that her activities demonstrated an ability to perform the physical functions required by light work. *Id.*  The ALJ also considered plaintiff's testimony regarding her daily activities and stated that plaintiff's claim of limited use of her upper extremities due to carpal tunnel syndrome were inconsistent with the medical evidence and with plaintiff's own testimony. (T. 17).

The ALJ also carefully analyzed the limitations imposed by plaintiff's treating physician, Dr. Radana Dooley. (T. 17).  The ALJ recognized the extra weight given to "well-supported" opinions by treating physicians, but placed more weight on the

6

opinion of consulting physician, Dr. Albert Paolano, who stated that he did not find any limitations and that plaintiff was not giving "her best effort" during the testing. *Id.* The ALJ found that plaintiff could perform her past relevant work, but also found that even if her past relevant work could somehow be considered "heavy"[2] work, she would be able to perform other light work in the national economy by utilizing the Medical Vocational Guidelines. (T. 18-19) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.17).

## V.    MEDICAL EVIDENCE

Plaintiff underwent an anterior cervical discectomy and fusion on March 17, 1995, based on a finding of degenerative disc disease at C4-C7 that was most prevalent at C5-6 and C6-7. (T. 350, 365-67).  The discectomy was performed by Dr. Fredric Fagelman of North Country Neurosurgical Associates.  An MRI performed on February 26, 1998 showed spinal stenosis with mild compression effects on the spinal cord at C6-7 and post-operative changes at C6-7. (T. 349).  The MRI report also showed mild bilateral foraminal encroachment at C5-6 and C6-7 from osteophytic spurring which appeared stable. *Id.*

Plaintiff continued to have problems after the surgery and saw Dr. Fagelman for several follow-up appointments. (T. 223-37).  On March 29, 2000, Dr. Fagelman wrote that things were "about the same with neck pain, arm pain, and some spasms." (T. 225).  Dr. Fagelman stated that there was "nothing new neurologically," and

---

[2] This finding would mean that plaintiff could not perform her past relevant work, and  would shift the burden to the Commissioner at Step Five of the disability analysis to determine whether plaintiff could perform other work in the national economy.

plaintiff had a "50 percent disability." *Id.* He gave plaintiff a prescription for Motrin and she was to "return as needed." *Id.* On November 27, 2002, Dr. Fagelman's report stated that plaintiff was still having a lot of trouble with her back and her neck, with occasional weakness or "trouble" in her left arm. (T. 224). Dr. Fagelman stated that he could not find anything new neurologically, but that plaintiff had not had "any new evaluation in years . . . ." *Id.* He added a prescription for Flexeril to use with her Ibuprofen, and he suggested that she add Tylenol. *Id.*

Plaintiff developed problems with low back pain and "tiredness" in her lower extremities. (T. 213). An MRI in May of 2004 showed evidence of spinal stenosis at L4-5 from "ligamentum flavum hypertrophy" and broad-based disc protrusion. *Id.* She began seeing Dr. James S. Greenspan, a neurosurgeon. (T. 221-22). On September 30, 2004, Dr. Greenspan performed a bilateral decompressive laminectomy at L4-5. (T. 207-14). On November 17, 2004, Dr. Greenspan reported that plaintiff had "done well." (T. 218). Her lower back discomfort and the tiredness in her legs had both improved. *Id.* She could flex forward and touch her ankles and extend normally. *Id.* There were no focal neurologic deficits noted in her lower extremities. *Id.* Dr. Greenspan concluded that "[w]hen we focus strictly on her symptoms of lumbar spinal stenosis, the patient has a lot of somatic complaints." *Id.*

Plaintiff was examined consultatively on December 21, 2006 by Dr. Albert Paolano. (T. 177-79). Dr. Paolano found that plaintiff's gait was normal; the ranges of motion in her shoulders, elbows, wrists, hips, and ankles were all normal. (T. 178). She had some limitation in the cervical region, but did not complain of pain or

discomfort with the movements that she could perform. *Id.*  When asked to bend forward, plaintiff would only flex 15 degrees, claiming that to go any further would cause back pain. *Id.*  The doctor "questioned" plaintiff's full participation with the testing.  Plaintiff's strength was 5/5 bilaterally and symmetric in the upper and lower extremities. *Id.*  Grip strength was 5/5 on the left and 4 to 5/5 on the right. *Id.*

Although the fifth digit on plaintiff's right hand had an old abnormality, the result of which was that plaintiff could not fully extend the finger, she was able to open and close her hand without difficulty, and she could oppose all fingers to her thumb, showing "fairly normal dexterity."[3]  Dr. Paolano concluded that he did not find any significant abnormalities on physical exam, other than in the lumbosacral spine exam, during "which [he believed] the patient was not giving her best effort . . . ." (T. 178-79). Straight leg raising test was negative "and fairly benign with complaints of tightness." (T. 179).  There were no significant deficits with her right hand. *Id.*

X-rays of plaintiff's cervical spine showed degenerative disc changes from C4-5 through C6-7 "without definite progress since the last radiographic study of 2001." (T. 180).  X-rays were also taken of plaintiff's lumbar spine and compared with those taken in 2001. (T. 181).  The radiologist noted that since the 2001 x-rays, plaintiff had undergone a laminectomy at L4 and L5. *Id.*  There were no fractures, spondylolisthesis or disc space narrowing, no bone tumor, and the sacroiliac joints were grossly normal.

---

[3] The court notes that there appears to be a typographical error in Dr. Paolano's report.  (T. 178).  Dr. Paolano discussed the abnormality in plaintiff's finger, and then he stated that plaintiff "otherwise showed signs of any atrophy of either hand muscle, thenar, hupothenar or intrinsic." *Id.*  It is clear from the context of the sentence that Dr. Paolano meant to say that plaintiff showed "[no]" signs of any atrophy . . . ."

*Id.*  The doctor's impression was "[n]o evidence of acute lumbar spine pathology." *Id.*

On January 17, 2007, a disability examiner reviewed plaintiff's medical records and completed a Residual Functional Capacity (RFC) evaluation. (T. 182-87).  The examiner concluded that plaintiff could lift and/or carry up to 10 pounds frequently and 20 pounds occasionally; stand and/or walk for about 6 hours in an 8 hour work day; sit for about 6 hours in an 8 hour work day "with normal breaks;" and had an unlimited ability to push and/or pull "other than as shown for lift and/or carry." (T. 183).  Plaintiff could occasionally climb and stoop, and she could frequently balance, kneel, crouch, and crawl. (T. 184).  She had no established manipulative limitations. *Id.*  The examiner found plaintiff's statements to the contrary "mostly not credible," based on the "minimal objective findings" and on Dr. Paolano's comment that plaintiff was not making a full effort on testing.  (T. 185).

On August 1, 2007, plaintiff was referred to Dr. Radana Dooley by Physician's Assistant, Laurie Gates. (T. 323-25) (Dr. Dooley's initial report).  Dr. Dooley is affiliated with Adirondack Rehabilitation Medicine.  Plaintiff told Dr. Dooley that she had been unable to work since 1993 due to her lumbar and cervical problems and that she had applied unsuccessfully for Social Security Disability in 2001. (T. 323).  Her physical examination showed a smooth, regular gait, symmetric bilateral muscle size, with "firm muscle tone." (T. 324).  Range of motion with passive and active maneuvers was equal between contralateral joints. *Id.*  Dr. Dooley stated that "[m]anual muscle strength testing *is not believable* secondary to her possibly decreased effort except of decreased grip strength to 4/5." *Id.* (emphasis added).

Dr. Dooley stated that in the area of her cervical spine, plaintiff had a "severely" limited range of motion, however, it was "difficult to tell if it [was] lack of effort or actual limitation." *Id.* Two tests used to evaluate neck pain, Spurlings and L'hermitte, were both negative. *Id.* Plaintiff refused to bend forward for her lumbar spine exam, for fear of having "difficulty later on during the day. . . ." *Id.* Straight leg raising was positive while sitting, and she had difficulty lying down flat on her back. *Id.* Plaintiff had decreased sensation overall in her distal as well as proximal lower and upper extremities and complained that she did not feel pinprick. *Id.*

Dr. Dooley's initial assessment was that plaintiff had been suffering "a very long time" from chronic pain syndrome. (T. 325). Dr. Dooley stated that the only thing she could offer plaintiff was a prescription for Cymbalta for "possible peripheral neuropathy as well as difficulty sleeping with depression, and anxiety." *Id.* Dr. Dooley gave plaintiff samples of Cymbalta and suggested that it was "appropriate to evaluate [plaintiff] for actual peripheral neuropathy with EMG and nerve conduction study." *Id.*

Dr. Dooley examined plaintiff again on October 8, 2007 and on November 27, 2007. (T. 314-15, 312-13). The plaintiff's "Problem List" was at the top of Dr. Dooley's report. (T. 314, 312). The October 10 report stated that those problems were myofacial pain syndrome; status post cervical spine fusion; and lower back pain with radicular symptomatology to both lower extremities. (T. 314). On October 10, 2007, Dr. Dooley reported that plaintiff's arterial ultrasound; EMG; and nerve conduction studies all came back with "near-normal" results, without any evidence of peripheral

neuropathy or lumbosacral radiculopathy.[4] (T. 314).  Plaintiff's gait and posture were normal, and a musculoskeletal examination of her lower extremities showed normal range of motion.  *Id.*  The strength in her bilateral lower extremities was 5/5 throughout.  *Id.*  Sensation was decreased in patchy distribution throughout both extremities, with decreased vibration.  *Id.*  Reflexes were "1+ of lower extremities."  *Id.*  Dr. Dooley increased the dosage of plaintiff's Cymbalta prescription. (T. 315).

On November 27, 2007, plaintiff's "Problem List" was "Multiple Pain Issues; status post decompression in both the cervical and lumbar spine; and "[a]ssociated lower and upper back pain." (T. 312).  Dr. Dooley reported that plaintiff had returned after "not being seen for three months." (T. 312).  Dr. Dooley reviewed an updated MRI which showed "mild" degenerative disc disease at L3-4, with some disc protrusion, resulting in "mild acquired stenosis of the central canal and left neural foramen . . . minimally accentuated from the previous exam." *Id.*  Dr. Dooley saw the laminectomies, but stated that the central canal was "widely patent", with "minimally increased foraminal narrowing at L4-5 level since [sic] last exam in 2004." *Id.*  Dr. Dooley stated that "functionally," plaintiff was very limited, but that the EMG and nerve studies showed no radiculopathy and the arterial study showed "no compromise." *Id.*  Dr. Dooley repeated that manual strength testing was "not believable," secondary to her "possibly" decreased effort. (T. 313).

Plaintiff was also referred to Ellen Bombard, a Physician's Assistant at

---

[4] These studies were performed by Dr. Todd Jorgensen, one of Dr. Dooley's colleagues at Adirondack Rehabilitation Medicine. *See* (T. 314).

Adirondack Rehabilitation Medicine.  The original[5] record contains reports by PA

Bombard dated January 4, 2008 (T. 469-70); August 21, 2008 (T. 467-68); September

5, 2008 (T. 459-61); December 30, 2008 (T. 456-58); and March 9, 2009 (T. 489-91).

After the January 4, 2008 examination, PA Bombard completed an "Employability

Assessment" for plaintiff. (T. 471-72).  In that report, PA Bombard indicated that

plaintiff was "very limited" in walking, standing, lifting, carrying, pushing, pulling

and climbing, while she was only "moderately limited in her ability to sit as well as

using her hands. (T. 471).  There were no specifics regarding the amount of time that

plaintiff could perform any of these actions in a normal work day.

On August 21, 2008, plaintiff reported to PA Bombard that she was a bit more

uncomfortable than usual because she had started working again. (T. 467).  Plaintiff

reported that she was working six-hour shifts, five days per week doing

"housekeeping" at Great Escapes Lodge. *Id.*  PA Bombard commented that plaintiff

was "seemingly comfortable though she describes significant symptoms." (T. 468).

On December 30, 2008, plaintiff told PA Bombard that she was working as a

housekeeper, but felt that the increased work activity made the symptoms worse. (T.

456).  Plaintiff described upper extremity "electrical type pain" and numbness at all

five fingertips, however plaintiff was "currently not with pain, numbness or tingling

into the left leg and cannot tell me the course of radiation." (T. 457).

Plaintiff was tender to palpation at the mid high lumbar area and ascending

_____

[5] Plaintiff's counsel submitted an October 22, 2009 report from PA Bombard to the Appeals
Council.

paravertebrals to the low thoracic area. *Id.*  There was no tenderness to the SI joint, sciatic notches, or trochanters. *Id.*  Although she was able to flex to the floor, extension was limited to 10 degrees due to discomfort. *Id.*  Bilateral rotation was not uncomfortable. *Id.*  PA Bombard noted that plaintiff had varying degrees of motor strength testing, and that the examination was "extremely inconsistent" particularly because plaintiff was unable to plantar flex or dorsiflex with any degree beyond 3/5 without significant pain, but did not complain of pain when she was rising onto her toes. *Id.*  Plaintiff's cervical spine range of motion was limited in all fields with end range discomfort, but she had full range of motion of the shoulders, with complaints of tenderness at full abduction and full internal rotation. *Id.*  Tests for cervical radiculopathy were negative. *Id.*

Plaintiff's wrists appeared normal, with no swelling, deformity or pain to palpitation bilaterally, however, there was a positive Tinel's sign on the right. *Id.* Phalen's test, another test for carpal tunnel syndrome was negative bilaterally. (T. 457).  PA Bombard's "Assessment" states that plaintiff has a "long history of myofacial pain syndrome, cervical spine pain status post fusion and low back pain status post laminectomy. (T. 458).  The assessment further states that plaintiff had been examined several times over the past several months "for varying symptoms and varying degree of symptoms." *Id.*  However, plaintiff was continuing to work "in heavy physical labor." *Id.*  The plan was to use heat to the upper neck and back, increase her Cymbalta, take Ibuprofen, and schedule a carpal tunnel injection for her left hand. *Id.*

14

Nerve conduction studies dated August 26, 2008 and January 12, 2009 were consistent with carpal tunnel syndrome, bilaterally. (T. 308, 452).  In 2009, Dr. Jorgensen noted that there was evidence of progression from the August 26, 2008 study. *Id.*  Dr. Jorgensen classified the carpal tunnel syndrome as "moderate with involvement of both the median motor and sensory nerves." (T. 452).

The transcript also contains a substantial number of medical records from Hudson Headwaters Health Network Health Center, beginning in 2004.[6] (T. 242-79). The court notes that on July 12, 2008, plaintiff complained of low back pain and left arm numbness at work that was worse when she was weeding the garden. (T. 261). Plaintiff was released to go back to work without restrictions on July 15, 2008. (T. 260).  August 13, 2008, plaintiff was complaining of "slight" lower back pain, with tingling in both arms and muscle aches. (T. 258).  She was released to return to work without restrictions on the same day. (T. 258).  In fact, during 2008, there were several occasions when plaintiff went to the Health Network, but was released to return to work "without restrictions" on the same day or after two or three days. (T. 247-48, 251-52, 255-56, 262-63).

Dr. Dooley completed an RFC evaluation on March 10, 2009. (T. 487-95).  Dr. Dooley stated that plaintiff could sit for four hours per day, but only for one hour at a time. (T. 487).  Plaintiff could and stand and walk for only two hours per day, one hour at a time. *Id.*  Dr. Dooley stated that plaintiff would be required to have "stretch

---

[6] Some of the reports are not related to the impairments upon which plaintiff is basing her disability claim.(*See e.g.* T. 275-76, 278, 271, 264, 268, 247, 253).

breaks" and a change of position every hour. *Id.*  Plaintiff could lift up to 20 pounds occasionally and up to 10 pounds frequently. *Id.*  Dr. Dooley stated that plaintiff could not use either hand for "simple grasping" or for "fine manipulation," but could push and pull arm controls. *Id.*  She could use both feet for pushing and pulling leg controls, but could never crawl or climb. (T. 488).  Plaintiff could occasionally bend and squat, and she could frequently reach. *Id.*  She would be totally restricted from working at unprotected heights; moderately restricted in driving automotive equipment; and mildly restricted from exposure to marked changes in temperature and humidity and to dust, fumes, and gases. (T. 488).

The doctor stated that plaintiff's "work week" should be limited to 4 days per week and 6 hours per day. (T. 487).  Finally, Dr. Dooley classified plaintiff's pain as "moderate," which was defined on the form as pain that "[c]ould be tolerated but would cause marked hardship in the performance of the activity which precipitates the pain" and would "restrict the ability to maintain concentration." (T. 488).

In addition to the RFC evaluation, counsel submitted a narrative report, written by PA Bombard on March 3, 2009. (T. 489-91).  PA Bombard's report stated that plaintiff had bilateral carpal tunnel injections on January 12, 2009. (T. 489).  The plaintiff reported having some short-term relief from the numbness, tingling, and pain. However, plaintiff fell two days later, breaking the fall with her right hand and aggravating the pain in her wrist. (T. 489).  Plaintiff was still working five days per week, six to seven hours per day, "which very much aggravates her symptoms." (T. 490).  On physical examination, plaintiff walked with a normal gait and had full

strength in her extremities, upper and lower. (T. 491).  Wrist extension was 4/5 on the right, and finger flexion on the right was 3+/5, and thumb abduction and adduction was 3+/5, both "volitional and secondary to discomfort." (T. 491).  Plaintiff had diminished sensation to pinprick on the left fourth and fifth fingers. (T. 491).  The right hand had diminished sensation as to all five fingers. *Id.*

PA Bombard's assessment was that plaintiff's carpal tunnel, myofascial pain, and low back pain were "worsening," aggravated by her work which is "heavy and involves lifting and bending." (T. 491).  PA Bombard suggested that plaintiff obtain a splint for her wrist, ice her wrists, and avoid aggravating maneuvers. *Id.*  Plaintiff was referred to Dr. Signh for evaluation of carpal tunnel surgery. *Id.*

Finally, the record contains a report from PA Bombard, sent by plaintiff's counsel to the Appeals Council for review. (T. 493-95).  The report is dated October 22, 2009, long after the ALJ's hearing. *Id.*  PA Bombard states that plaintiff "presents today after a seven month absence." (T. 493).  Plaintiff was complaining of increasing pain, stiffness and fatigue with triggering of the right third finger as well as flexion contractures of the fingers in her right hand. (T. 493).  Plaintiff's low back pain was increasing, "stating that she failed to renew her medicaid coverage and has been out of all medications including Cymbalta and Neurontin." *Id.*  Plaintiff had been out of work "since the third week in August." (T. 494).

PA Bombard stated that plaintiff's symptoms had increased "probably due to the absence of Cymbalta and Neurontin." (T. 495).  PA Bombard ordered an x-ray and a repeat bilateral EMG study.  Plaintiff's sensation to pinprick had diminished

"significantly" on the right hand as well as on the forearm, but was mostly intact on the left. (T. 494).  Plaintiff had flexion contractures of two fingers on her right hand with triggering of the right third finger. (T. 494).  Plaintiff also had developed "thenar eminence"[7] atrophy on both hands, but less on the left. *Id.*

## VI.   NON-MEDICAL EVIDENCE and TESTIMONY

Plaintiff testified that at the time of the hearing, she was working at the Six Flags Great Escape Lodge in the indoor water park. (T. 25).  She worked five to seven and one half hours per day, five or six days per week. (T. 25-26).  She had been working at Six Flags since May of 2008. *Id.*  She testified that, prior to her work at Six Flags, she had not worked since 1993. (T. 26).  In 1993, plaintiff was working in the construction field and sustained an injury on the job that caused her to stop working. (T. 27).

Plaintiff stated that when she had the surgery on her neck, she "got her legs back," and after she had her back surgery, she did not feel like she was being "twisted." *Id.*  However, plaintiff also testified that, notwithstanding her two surgeries, she was "still tingling like I'm sitting on an electric fence a lot." (T. 27).  Plaintiff testified that she was "tingly" all the time. *Id.*  The pain "gets" her in the lower back, and it is "always there." (T. 27, 29).  Plaintiff testified that at the time of the hearing she was only taking Ibuprofen and hot showers for the pain. (T. 29).  Plaintiff stated that she "asked for something a little bit better that would knock it right out, but

---

[7] Thenar eminence is the ball of muscle at the bottom of the thumb. http://mw1.meriamwebster.com/medical/thenar%20eminence.

"they" would not give it to her because she could not "work" with anything else. *Id.*

Plaintiff stated that her treating physician was Dr. Dooley, who "found out that [plaintiff] was having anxieties." (T. 30). Plaintiff stated that she did not see Dr. Dooley often after plaintiff began seeing PA Bombard. *Id.* Plaintiff testified that she was not receiving any counseling or psychiatric treatment. (T. 31). Plaintiff stated that the Cymbalta and the Gabapentin (Neurontin), resolved her anxiety issues. (T. 32).

Plaintiff's job involved walking "all day long." (T. 32). She lifted and carried towels, and pushed the cart containing all the soap and shampoo. (T. 33). The towel bins weighed more than 20 pounds. *Id.* Her job also involved sweeping and mopping. (T. 33-34). She testified that she could only sit for 15 to 20 minutes. (T. 33). Plaintiff testified that although she could take care of her bathing and personal needs, she was "starting to have problems with that." (T. 34). Plaintiff stated that the fingers on her right hand would "lock right up." *Id.*

Plaintiff testified that she was able to wash dishes. (T. 35). She did not do laundry because her "machine broke," however, she was able to do the laundry at her neighbor's house. *Id.* In fact, plaintiff told the ALJ that she carried the laundry over to her neighbor's house by herself. *Id.* She vacuumed and swept at home even after she worked at the water park. (T. 36). Her boyfriend accompanied her to the grocery store. Plaintiff could knit with "no problem," but testified that she could not crochet or draw any more. (T. 36). Plaintiff testified that she did not do any sports activities because she got lightheaded after a bit. (T. 37).

In response to follow-up questions by plaintiff's counsel, plaintiff stated that

she could only knit for half an hour before she would "just tighten right up," and when

that happened, she would not be able to resume that activity until the next day. (T. 38).

She testified that when she started the job at Six Flags, she was only supposed to work

four hours per day, four days per week. (T. 40).  She did not complain when she was

assigned more work because "it was a job." *Id.*  Plaintiff stated that when she worked

a full day, she felt like her whole body was in a vice. (T. 40-41).  Her body ached,

throbbed, or she would get muscle spasms. (T. 41).  Plaintiff also testified that she

would take extra breaks at work, but had only missed one day of work in the three

months before the hearing. *Id.*

Plaintiff testified that she shoveled snow and mowed the lawn, when her

boyfriend did not want to do it, but that the lawnmower bothered her hands. (T. 42).

Plaintiff stated the shots for her carpal tunnel syndrome helped a little, but that when

she fell on the ice, the pain was aggravated. (T. 42).  Plaintiff stated that if she pushed

a broom or mopped for a period of time, her fingers locked up. (T. 43).  Plaintiff also

testified that the Cymbalta helped her mental state. (T. 43).  She stated that before she

took Cymbalta, she would cry all the time because her boyfriend said demeaning

things, but after the Cymbalta, she stated that she laughed at him and did not let him

bother her anymore. *Id.*

Plaintiff drove a standard transmission car, but was having trouble shifting

gears. (T. 44-45).  Plaintiff testified that at work, she had to lift plastic bags of trash

that weighed more than 20 pounds, but that her doctor had limited her to lifting 20

pounds. (T. 46).  However, plaintiff then testified that when she tried to lift a gallon of

milk, she would "start to get . . . a Charlie horse." *Id.*  Plaintiff testified that occasionally, she would have "confusion," and would get lightheaded because she was told that she did not drink enough water. (T. 47).  Finally, plaintiff stated that she was told that her carpal tunnel was "mild" and that she would not need to have surgery. (T. 48).

## VII.   ANALYSIS

### 1.      Residual Functional Capacity/Treating Physician

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities*. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.*  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In this case, the ALJ relied, in part, upon Dr. Paolano's RFC to determine that plaintiff could perform a wide variety of light work. (T. 17).  The ALJ also relied upon plaintiff's own testimony regarding the activities that she could perform, notwithstanding her impairments, including her part-time work at Six Flags.  In making this determination, the ALJ rejected the RFC evaluations, containing greater limitations, completed by Dr. Dooley and PA Bombard. (T. 17-18).  The ALJ correctly recognized the Treating Physician Rule, stating that the "'well-supported'" opinion of a treating physician is accorded greater weight than that of a physician who has only examined plaintiff once. (T. 18) (citing 20 C.F.R. § 416.1927).  The ALJ then found that Dr. Dooley's report was not "well-supported" by the evidence, including plaintiff's own testimony. *Id.*

This court agrees.  The court would first point out that there are only three examination reports actually written by Dr. Dooley: August 1, 2007, October 8, 2007,

22

and November 27, 2007. (T. 323-25, 314-15, 312-13)[8].  The rest of the reports from Adirondack Rehabilitation Medicine were authored by PA Bombard. (T. 456-70).  Dr. Dooley's RFC evaluation was written on March 10, 2009, when she had not seen plaintiff in more than one year.[9]  Dr. Dooley's August 1, 2007 report and her November 27, 2007 report noted that plaintiff's manual strength testing was "not believable secondary to her possibly decreased effort . . . ." (T. 313, 324).  Subsequent strength testing resulted in values of 5/5 "through both bilateral upper and lower extremities." (T. 470) (Bombard Report, dated Jan. 4, 2008).  In her August 1, 2007 report, Dr. Dooley also noted the limitation in cervical spine range of motion, but stated that it was difficult to tell whether it was due to lack of effort or actual limitation. (T. 324).

In any event, a review of Dr. Dooley's RFC shows that although Dr. Dooley stated that plaintiff could only sit, stand, and walk for one hour at a time, with sitting limited to four hours in an 8 hour day, and standing and walking, each limited two hours in an 8 hour day, the doctor's next statement was that "Claimant's work should be limited to 4 . . . days and 6 . . . hours per day." (T. 487).  It does not appear that Dr. Dooley believed plaintiff to be totally disabled.  On September 5, 2008, PA Bombard stated that she and plaintiff should discuss "needing to remove herself from her work

---

[8] There are duplicates of Dr. Dooley's reports at T. 480-82, 475-76, and 473-74.

[9] Plaintiff testified that she did not see Dr. Dooley much since plaintiff began seeing PA Bombard. (T. 30).

position or maybe *find a lighter duty work*."[10] (T. 461).  On January 4, 2008, PA Bombard completed an "employability assessment," where she stated that plaintiff was "very limited" in walking, standing, lifting, pushing and pulling. (T. 471).  According to PA Bombard, plaintiff would be "moderately" limited in her ability to sit. *Id.*  None of these terms were quantified.

The court also notes, as did the ALJ, that the findings on several examinations were inconsistent with the amount of pain and limitation that plaintiff alleged.  In addition to both Dr. Dooley and Dr. Paolano questioning plaintiff's effort, there are various reports that find plaintiff describing severe symptoms, but PA Bombard finding inconsistent results upon testing.  On September 8, 2008, PA Bombard reported that the plaintiff's review of systems was "unchanged" from October 8, 2007, but that with each exam, plaintiff reported a "new and different symptom." (T. 460).  Plaintiff's gait was normal, she was able to bear weight equally with both legs, and was able to rise onto her toes and heels. *Id.*  She got onto the examination table "independently and easily." *Id.*  Although the range of motion in her cervical spine was limited with discomfort, muscle motor testing was at full strength. (T. 460).  In September of 2008, plaintiff had negative straight leg raising and negative Tinel's. *Id.*  Additionally, PA Bombard noted that plaintiff had "sensation to pinprick in an inconsistent manner with repeated testing." *Id.*  On December 30, 2008, PA Bombard stated that plaintiff "ascends the exam table and sits easily." (T. 457).  Plaintiff's

---

[10] Apparently PA Bombard believed that plaintiff's housekeeping job at Six Flags was "heavy" work." (T. 458, 461).  It is unclear whether PA Bombard is familiar with Social Security's definition of "heavy work."

motor strength testing was "extremely inconsistent, particularly with her unable to plantar flex or dorsiflex with any degree beyond 3/5 without significant pain though she does not complain of pain when she is rising on her toes."[11] (T. 457).

Plaintiff's description of her own abilities was inconsistent with the restrictions in the RFC evaluations.  Plaintiff's counsel argues that Ms. Cook never described engaging in a significant amount of physically demanding activity at home,[12] however, she did just that.  Plaintiff stated that she washed dishes, vacuumed and swept at home. (T. 35).  Although plaintiff stated that she did not do the laundry at home, the reason was that her machine was broken.  *Id.*  She then stated that her neighbor would let plaintiff do laundry.  *Id.*  Plaintiff testified that she carried the laundry over to her neighbors house by herself.  *Id.*  She said: " I don't get no help with that part."  *Id.*  Plaintiff also drove a standard transmission car. (T. 44).  Plaintiff testified that she shoveled snow and mowed the lawn, although she could not do it well, and the lawnmower bothered her. (T. 42).

Plaintiff testified that she walked all day at her job;[13] lifted and carried towels;[14]

---

[11] Plantar flexion is defined as movement of the foot that flexes the foot or toes downward toward the sole. http://merriam-webster.com/medical/plantar%20flexion.  Rising on one's toes is essentially weighted plantar flexion.

[12] Pl.'s Brief at 11.

[13] (T. 32).

[14] (T. 33).

pushed a cart filled with soap and shampoo;[15] swept and mopped;[16] and lifted trash bags out of barrels. (T. 45-46).  She also testified that when she first started working, she took time off for medical reasons, but in the three months prior to the hearing, she had only taken time off once. (T. 41).  The records from Hudson Headwaters Health Network also support the ALJ's finding that plaintiff could engage in light work. Through 2008, when plaintiff visited the Hudson Headwaters Health Network, she was released to go back to her job without restrictions, even after being examined for pain related to her severe impairments. (T. 258-59).  In July of 2008, plaintiff complained of low back pain with left arm numbness at work. (T. 261).  The numbness was worse when she was weeding the garden. *Id.*  Plaintiff was out of work for three days, but then was allowed to return to work without restrictions. (T. 260-61).  In August of 2008, the report states that plaintiff was complaining of "slight lower back pain." (T. 258).

The court must also point out that, according to the regulations, PA Bombard is not an "acceptable medical source," treating or otherwise. *See* 20 C.F.R. § 416.913(d) (1).  Acceptable medical sources are defined in the regulations. *Id.* § 416.913(a).  The opinions of medical professionals such as Nurse Practitioners and Physicians Assistants may be considered, but they are not entitled to the controlling weight of the well-supported opinion of a treating physician. *Geiner v. Astrue*, 298 Fed. Appx. 105, 108 (2d Cir. 2008); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009).

---

[15] (T. 33).

[16] (T. 34).

26

The ALJ in this case was entitled to reject the restrictions imposed by Dr. Dooley and was entitled to rely on Dr. Paolano's opinion, together with plaintiff's own testimony and an analysis of the medical evidence of record.  Thus, the ALJ's RFC determination was supported by substantial evidence.[17]

### 2.   Pain and Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments could reasonably be expected to produce the pain or other symptoms alleged.  20 C.F.R. § 416.929(b).  Second, if the medical

---

[17] Long after the hearing, plaintiff's counsel submitted a medical report, dated October 22, 2009, signed by PA Bombard. (T. 493-95).  The report was considered by the Appeals Council, with plaintiff's brief, in rejecting plaintiff's request for review of the ALJ's decision. (T. 4).  The Appeals Council found that the additional evidence did not provide a basis to change the ALJ's decision. (T. 1-2).  A review of the report shows that by October 22, 2009, it appeared that plaintiff's carpal tunnel symptoms were increasing, however, because the report was authored by a physician's assistance, the Appeals Council was entitled to reject the opinion.

evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 416.929 (c)(1).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 416.929(c)(3)(i)-(vii).

In this case, the ALJ did not doubt that plaintiff's medically determinable impairments could reasonably be expected to cause plaintiff pain, however, the ALJ determined that the plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC determination. (T. 16). The ALJ considered plaintiff's statements somewhat out of proportion to the medical evidence and inconsistent with her own testimony regarding her daily activities. The ALJ noted that plaintiff testified that her

current course of treatment was over-the-counter medication[18] and hot showers. (T. 18, 29).  Plaintiff testified that "they" would not give her anything else because I can't work with anything else." (T. 29).  Plaintiff's statement is a little unclear.  However, she did state that the Ibuprofen helped if she "doubled up" on them.[19] (T. 29).  As stated above, the ALJ is entitled to make credibility determinations as long as he engaged in the proper analysis.

Finally, the court notes that the ALJ recognized that some reports referred to plaintiff's work at Six Flags as "heavy." (T. 18).  The ALJ then found that, even assuming plaintiff could not return to her work at Six Flags because that work was more strenuous that the ALJ's RFC determination would allow, she could perform a wide range of other light work and was therefore, not disabled.  Disability requires more than the inability to work without pain. *See Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).  In order to be disabling, the pain must be so severe as to preclude any substantial gainful activity. 42 U.S.C. § 423(d)(1), (d)(5).  Thus, although plaintiff may be in some pain, the ALJ's finding that the pain is not severe enough to preclude plaintiff from performing light work is supported by substantial evidence.

### 4.    Vocational Expert

If a plaintiff's non-exertional impairments "significantly limit the range of

---

[18] The reference to over-the-counter may refer to Ibuprofen itself, because Ibuprofen 800 mg. is generally not purchased over-the-counter.

[19] The court does note that PA Bombard told plaintiff not to do that. (T. 491).

work" permitted by the plaintiff's exertional limitations, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  If the plaintiff's range of work is significantly limited by his non-exertional impairments, then the ALJ must present the testimony of a vocational expert or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform.  *Id.*  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

In this case, plaintiff argues that the ALJ should have called a vocational expert because of plaintiff's "persistent" depressive symptoms and her inability to bend, squat, crawl, or climb. (Pl.'s Brief at 12-13).  There is absolutely no evidence that plaintiff has a severe mental impairment.  In fact, although plaintiff was prescribed Cymbalta by Dr. Dooley, the doctor's report stated that this medication was being prescribed for "what appears to be possible peripheral neuropathy as well as difficulty sleeping with depression and anxiety." (T. 482).  There is no evidence that plaintiff's alleged anxiety had any affect on her ability to work.  Plaintiff testified that Dr. Dooley "found out I was having anxieties." (T. 30).  Plaintiff also testified that the Cymbalta was working, and that she did not have anxiety since she started taking it. (T. 32).

The only reference to concentration was Dr. Dooley's "check mark" on the

March 2009 RFC assessment, indicating that plaintiff's pain was "Moderate." (T. 488).  The definition of "moderate" on the form that Dr. Dooley completed states that the pain "[c]ould be tolerated but would cause marked hardship in the performance of the activity which precipitates the pain; would restrict ability to maintain concentration." (T. 488).  There is absolutely no medical support in the record referencing any lack of concentration suffered by plaintiff, and certainly no support for the proposition that any lack of concentration was related to a mental impairment that would significantly restrict the full range of light work sufficient to require resort to a vocational expert.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that the Commissioner's decision be AFFIRMED, and plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 3, 2011

Hon. Andrew T. Baxter
U.S. Magistrate Judge

31